White, Judge,
dissented on one point, and delivered the following opinion.
This is a motion against John Preston the late treasurer, and his sureties, upon his bond as treasurer. This bond is dated on the 18th January 1819, and conditioned, for his faithful performance of the duties of his office, during the ensuing year. The words of the condition are, “now if the said John Preston shall faithfully ac- “ count for all monies and other things which shall come “ to his hands in virtue of his office, and perform all “ other articles thereof according to law, then this oh- “ ligation to be void, otherwise to remain in full force “ and virtue.”
*297 The notice given to the defendants of this motion, recites the bond, and the condition; and concludes by averring, that the condition has not been complied with.
John Preston did not appear to defend the motion, aud judgment by default was entered on a writ of inquiry awarded against him. The other defendants, his sureties, appeared, and pleaded three pleas. The third of these pleas, was properly overruled on a general demurrer. The appellant’s counsel, then moved the court, to reject the second plea; which motion was perhaps properly overruled; at least it was not an error which ought to be available in an appellate court. The parties then came to issue on the 1st and 2d pleas, which though different in form, in substance presented the same issue: which issue was this; the defendants said that a sum of money, viz;: gl,200,251 36 and no more, came to the hands of John Preston as treasurer, between the 18th January 1819, and the 17th January 1820, the period for which they were bound; and that he did faithfully account for all the said monies which came to his hands in virtue of Ms office during the term thereof. The plaintiff on the other hand avers, that a sum larger than $1,200,251 36 came to the hands of the said Preston in virtue of Ms office between the said 18th January 1819 and 17th January 1820; and that he did not account for, or pay the aforesaid sums of money, &c.; but the same did divert, misapply, and convert to his own use; and so had violated the condition of the bond.
By these pleadings two facts were presented for the decision of the jury. 1st, whether between the 18th January 1819 and 17th January 1820, more money than $1,200,251 36 did come to the hands of the said Preston in virtue of Ms office; and 2d, whether the sums actually so received, were faithfully accounted for.
The plaintiff to support the issues on his part, offered in evidence, the books of account of the treasury department, which were proper evidence, and were not object *298 ^°" ^1'01111 ^iese hooks it appeared among other things. that there had been paid into the treasury before and during the year 1819, and up to the 17th January 1820, suííl $833,297 7 more than had been disbursed for the public service; which money ought to have been hi the public coffers, and the fair presumption from the face 0f the books was, that it was there. But upon a count, it was found that $83,099 30 of the money was not to be found. When did tills eloignment take place? now became the. important question between the parties. If it was eloigned before the 18th January 1819, it was not within the condition of the bond on which the motion was made; and the verdict should have been for the defendants on the issues made up. If it was after that day. the plaintiff was entitled to a verdict.
The plaintiff rested his case on the treasury hooks alone, and insisted, that as they shewed this money had been received, and did not show that it had been disbursed for the commonwealth, it must be taken to have been in the treasury on the day of the date of the said bond, and of necessity, to have come to John Preston’s hands in virtue of his said office, after that date, to the-exclusion of all evidence to the contrary. The defend - ants on tlieir part introduced evidence, calculated to satisfy the jury, (if proper to be submitted to them) that inf act this eloignment took place in the year 1818, and before the date of the defendants’ bond,. on which the motion was made; which was the very fact in issue before the jury. And this evidence being submitted to the jury, did satisfy them, that the eloignment in dispute took place before the execution of the bond, and they found a verdict for the defendants.
The counsel for the appellant had however moved the court, to exclude tills testimony on behalf of the defendants from the jury; and excepted to the opinion of the court, overruling his motion. The question now to be decided is, whether the testimony offered by the *299 defendants ought to have been heard by the jury upon these issues? I had supposed it could not be questioned, if this had been a private transaction; if Preston had been the factor of a foreign merchant, and had given bond and security every year, for faithfully discharging Ms duties, and such a case as the present had arisen he-tween the employer, and Preston and his sureties fordiff'erent years, (this is in effect a contest between the sureties, to Preston it is immaterial on what bond he is made responsible) that both Preston and Ms sureties would be let in, to shew by evidence, the truth of the case. If this be not ihe law, not only I, but every lawyer with whom I have practised, or who has appeared before me for thirty-seven years, has laboured under a strange delusion. I am aware that the confession of a party may be given in evidence against him, and is not evidence for him; but when it is so given although it be strong, it is not so conclusive, as to prostrate his rights against the truth of the case; but he is at liberty, to shew by other testimony that he made the statement under a mistake, through misunderstanding, or inadvertence. The rules of law, and the demands of justice, ever searching for the real truth, absolutely require, that such evidence should be heard. Even against the principal you can not recover for a default, not within the condition of the bond; much more should this be the case, when there is another bond, to indemnify the obligee against that very default. Is it more consistent with law and justice, that the obligor and his sureties, should be made liable upon a bond which does not covenant against the act complained of, when there is another bond which does cove nant against that act, in the case of the treasurer, than it would be in any other? If this be so, it must be, be, cause the law has ordained it, from principles of public policy; and that is the ground taken. It is said, that Che defendants are concluded, that is estopped, from *300 Prov*nS ^7 any evidence other than these books, that there is any mistake or error in them.
An estoppel is that which prevents one from shewing ^ie ^ru^1 in defence of his rights: call it by what name we will, it is that which shuts out the evidence of the actual truth of the case. For this reason, estoppels have ever been held to be “repugnant to reason, and odious in law.” They are tolerated in a very few cases, and only from absolute necessity. Even in these cases, Judges have for ages been astute, to unshackle the es-topped, by every means in their power. If these books do work an estoppel, it is not by the operation of the statute, for that does not pretend to alter their nature as matter of evidence. Neither is it by the general principles of the common law, which holds estoppels to be odious. No case has been adduced, to shew they work an estoppel; no dictum of any judge, lawyer, or writer has been referred to, as even intimating such a doctrine; and I undertake to say, that there is none. In England there is a treasury, a treasurer, and treasury books: those books no doubt are kept by an officer under the solemnity of an oath; suits, and prosecutions must have arisen in Which the evidence furnished by the books became necessary [as in Lord Melville’s case;] there are in England too, many great public corporations, in which books are kept as those now in question; the law treatises and reports, contain many cases as to the manner of giving them in evidence, and their effect when offered; but not a word is any where said, of their working an estoppel: such an idea was never conceived in any of the numerous cases decided. That they operate by way of estoppel is attempted to be shewn, by analogies drawn from reasoning adopted by this court. The argument does not convince my understanding. The cases referred to, [except that of Noland v, Cromwell,] depend on statutes constituting judicial tribunals, and expressly declaring that their decisions shall be final. And Noland v. Cromwell, *301 was decided on the long established principle, that a party having a good defence at law, shall not be relieved in equity, for failing to make it; and that the entry in the surveyor’s books, was sufficient notice, and that the party should 'not aver an ignorance of the entry or a want of notice in this case, any more than of a recorded deed, to which the statute has assimilated it.
Nor does it alter the case, that the treasurer is a sworn officer. His swearing to do his duty, does not make entries in the treasury books true, which arc in fact false. In the case of Goode v. Galt(c) lately decided by the court of appeals, a judgment was reversed for an error which grew out of the false return of a sheriff (though made upon oath,') and the cause was sent back with orders, that the sheriff should be permitted to amend the return.
I admit that these are public books, bought with public money, kept for public purposes under the sanction of an oath. They are evidence of a high and solemn nature, and should only he outweighed by direct and decisive testimony. But that they are to shut out, or were ever intended to shut out the daylight of truth, 1 do not, and cannot believe. Notwithstanding the guards which are provided, these books like all others, may contain errors. Can it be believed, the legislature intended, that even if evidence should he offered proving erroneous entries, as clearly as any thing can be proved, still such evidence must be rejected and the Jury compelled to find a verdict against the very truth and justice of the case? and this under the old, and odious doctrine of estoppel; for odious I must call it, since it is so held in every book in Which it is mentioned: an estoppel too, applied to a new subject, in an entirely new way. Had the legislature intended this innovation on the best established principles *302 of evidence, it would have declared its will, in express . terms.
It is said, that the case ought to be considered, as if a different individual had been chosen Treasurer, and had given a new bond, every year. That in such a case, books transferred to the succeeding Treasurer, shewed a certain balance ought to be in the treasury, hut in fact the money had been eloigned, and the successor through false confidence or any other motive, received the books without counting the money, and reporting the deficit, that he and his sureties would be precluded from shewing, that he was not the actual embezzler, and that the money had been converted by his predecessor, before he came into office; that such conduct would be a breach of official duty, and that a suit might be prosecuted against the succeeding Treasurer and his sureties; that the Commonwealth might recover on assigning the fact as a breach of the condition to the full extent of the loss actually sustained, I do not deny; but that on a suit charging the succeeding Treasurer with being the actual embezzler, during the year in which he was Treasurer, at once destroying his character, and charging his sureties to the exoneration of the real culprit and his sureties; on an issue too, made up to try the precise fact; whether the default and embezzlement occurred in one year or the other, the party should be estopped from proving his innocence and the guilt of his predecessor, and thus charge the sureties who are really hound, I cannot admit.
If these hooks work an estoppel, why were they not pleaded in the replication? Why was issue joined, upon the facts set forth in the plea? Why did the attorney go to trial before the country? By going before the Jury on the issue tendered, he has loosed the estoppel, and let in the evidence of the truth. I cannot perceive the force of the reasoning, by which this estoppel is main *303 tained. If the fact be, that the embezzlement took place in 1818, and is not within the condition of the bond for 1819, can the estoppel change the actual fact, and make that true which is false? Will it make that which was done in 1818, to have been done in 1819? Will it alter the eternal principles of justice, and make that right, which is in itself wrong? If on the other hand, the whole evidence be laid before the Jury, will not the Jury under the direction of the court, in this case as in the more awful ones of life and death often presented to its deliberation, be competent to weigh the evidence, and determine what is true? and even if the Jury should err in its decision, that error may he corrected, by granting a new trial. 1 do not see that the monstrous evils anticipated, will result from suffering the facts in cases affecting the public revenue to ho given in evidence to the Jury. When the commonwealth arraigns a citizen at her bar for treason or murder, (the highest crimes known to our jurisprudence,) she submits the case both on the law and the facts to a Jury. If she cannot in proceedings against the Treasurer, submit the law of the case to a Jury, surely it is a stronger reason why the Jury should at least pass judgment, on the facts affecting the case.
This is an estoppel of a new character. It is said, the hooks work no estoppel as to the commonwealth; she may contradict the hooks. The old fashioned estoppels, even in the sternest periods of the English law, were reciprocal: both parties were estopped, or neither.
It has been remarked, that this case ought to fee decided on great principles. Controversies in courts of justice, ought to be decided on correct principles always; on great ones when they apply. I know of no principles of law great or small, which can convert these books into an estoppel on either party. There is however one great and fundamental principle, which runs through the bill of rights, the constitution, and the laws of the *304 land; it ought to exist in the laws of every nation upon earth; the principle, that every free citizen whether in a civil or a criminal proceeding, has a right to be heard ]n hjs defence; to produce his witnesses, and to have a „ m. ¿air and impartial trial on the merits of Ins cause. The oommonwea^h can claim no exemption from the operation of this equal rule, in a controversy with the meanest of her citizens. However bound to her by allegiance 'and by reverence, when she appears in the character of a suitor, her tribunals of justice can recognise in her, no claim to superiority in rights, over the vilest of mankind. From this great principle I would deduce the inference, not that the defendants were estopped, and the commonwealth, abroad, and at large; but that neither party was estopped: that both might prove by evidence competent in ordinary cases, the whole truth of the case; and that the defendants had a right to prove the only material fact which the Jury was sworn to try. I say the only material fact, because that the money was once in the treasury, and was embezzled, is admitted on all sides: the time when it was embezzled, is the only fact in dispute, and that was the point to be settled by the Jury.
But granting that these books operate as an estoppel, and such an one as was never before heard of, an estoppel to one party only, what do they estop the defendants from proving? That the facts stated in those books are not true. But do the books also estop the defendants from shewing, that the inferences drawn by the appellant’s counsel from the books are false? The books ho where shew that the money was in the treasury when this bond was executed, or at what time it was eloigned.— Facts are stated, from whence it is inferred by logical deduction, that the money was in the treasury when the bond was executed, and therefore must have been eloigned thereafter. Are the defendants estopped from shewing by express and undeniable proof, that the money was taken from the treasury, and embezzled,'before they exe *305 euted the baud? Suppose that fact made to appear beyond the possibility of doubt, what will become of these inferences of logic? They vanish like mist before the sun. Even if the proof adduced in this case was not sufficient to outweigh the evidence furnished by the hooks, other cases may occur in which it would he sufficient. The precedent now to be fixed, will operate in all future cases, between the commonwealth, the treasurer and his sureties. I cannot consent to the establishment of such a rule. For these reasons, and others, which I would have stated, had the very short time I have had to ar~. rango my ideas, permitted, 1 am of opinion, that the judgment of the general court on this point was correct.

 Ante 153.